IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Alexandria, Virginia

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:06cv143 |
| | ) | |
| $41,500.00 in U.S. Currency, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This is a civil forfeiture action under 21 U.S.C. § 881 *et seq.* The complaint for forfeiture alleges, *inter alia*, that the defendant currency represents proceeds traceable to controlled substance transactions and is therefore forfeited to the United States pursuant to 21 U.S.C. § 881(a)(6). Claimant Jeremy S. Sheridan filed a verified statement of interest or right demanding the release and restitution of the seized currency. After a bench trial, the court ordered the parties to submit supplemental briefs on the issue whether claimant is an "owner" of the money in dispute. The case has now been fully briefed and argued. This opinion constitutes the court's findings of fact and conclusions of law.

For the following reasons, the court finds that the government has not met its burden of proving a substantial connection between the defendant currency and a controlled substance offense; that claimant is an "owner" of the currency in issue, and that claimant is entitled to return of the currency.

## Summary of the Evidence

On November 3, 2005, claimant purchased a one-way ticket to travel from Dulles

International Airport to Long Beach Airport in California.  At the airport security checkpoint, he was stopped by Jason Smedley, a Transportation Security Administration baggage screener. Upon a search of claimant's bag, Smedley found $41,500 in cash.  The cash was bundled in three stacks of $100 notes, one stack of $50 and $100 notes, with each of those surrounded by a white paper band, as well as one stack of unbanded $50 notes.  Each of the five stacks was wrapped in a plain white sheet of paper and placed in a white envelope; the five envelopes were placed in a larger manila envelope.

Smedley called Metropolitan Washington Airports Authority Police Sergeant Joseph Kluh, and Sergeant Kluh questioned Sheridan about the money.  Sergeant Kluh asked claimant about his travel plans and about the source of the money.  Claimant said he was going to California to gamble.  He did not identify anyone else as a source of the money.  At the end of the questioning, DEA Task Force Officer Stephen D. Smith was called to the scene by Sergeant Kluh.  Officer Smith conducted a background check on claimant which revealed that claimant was not wanted for any crime but did have some criminal history.  Officer Smith conferred with Sergeant Kluh and determined that they would seize the money, given the conversation between claimant and Sergeant Kluh and the results of the background check.  Officer Smith gave claimant a receipt for the money and secured it.  He brought the money to the police station at Dulles Airport.

Once at the station, Officer Smith conducted a canine narcotics detection examination with his drug-detection canine, Max.  Officer Smith described the procedure used for this examination.  The money was put into a plastic bag and placed in the bottom drawer of a desk located in a conference room.  Max was brought into the room and performed a sweep, and he

alerted on the money by scratching at the drawer containing the money.  The next day, Officer

Smith deposited the money in a bank in exchange for a cashier's check.

　　　Claimant was not charged with any crime in relation to these events.

　　　The foregoing facts are undisputed.

　　　There was some dispute about what was said during claimant's conversation with

Sergeant Kluh.  Sergeant Kluh testified that claimant said he did not know if there were casinos

in California, but claimant denies saying this.  Sergeant Kluh also testified that claimant said he

"withdrew" the money from the bank, while claimant testified he only said he had gotten it from

the bank.  This difference is immaterial.

　　　The government also offered the testimony of Daniel Page, who had trained Max as a

drug-detection canine.   He testified that Max had been well- trained and is a competent drug-

detection canine, and that in his experience dogs he trained did not alert to normal currency.  On

cross examination, claimant raised issues about the methods used in the canine examination and

about Max's reliability.   Claimant presented evidence that Max had a record of false alerts and

was not certified by the United States Police Canine Association.  The government argued that

unproductive alerts were merely inconclusive, not necessarily inaccurate, because  the area

alerted on might previously have contained what the dog was trained to find.

　　　 The primary factual dispute, of course, is over the source of the defendant currency.

Claimant testified that approximately $35,000 of the money came from his housemate, Oliver

Bauer, that the remaining $6,500 is savings from his income, and that the money has no

connection to any crime.  Plaintiff contends that its evidence establishes the necessary nexus to a

controlled substance transaction.

At trial, both claimant and Mr. Bauer testified that Mr. Bauer gave claimant the $35,000 to use for gambling at California casinos.  Claimant testified that he lives in a home owned by Mr. Bauer and that he and Mr. Bauer share the house, though Mr. Bauer travels frequently so he is rarely at the home (Partial Trial Transcript ("PTT") 8-9); that he took the money with Mr. Bauer's permission from a safe in the home (PTT 12); that he took the money to two banks and exchanged it for larger bills (PTT 12-13); and that he did not mention Mr. Bauer as a source for the money when he was questioned by Sergeant Kluh because he was in a hurry (PTT 10-12).

Mr. Bauer testified that the $35,000 was his and that he authorized claimant to remove it from a safe in the home to use on a gambling trip (PTT 39-40).  He testified that the money had been accumulated over time from various sources, that he considered it "play money," and told claimant to take it as a spur of the moment decision (PTT 35, 38-40).  During cross-examination, when pressed by the government as to why he kept such a large amount of cash in a safe in his home, Mr. Bauer said he did not want his ex-wife to know about the money (PTT 44-48).

The government does not offer a specific set of alternate facts to explain the source of the money, but argues that claimant's explanation is incredible and his statements to Sergeant Kluh are inconsistent with his later testimony.  It argues it is not reasonable to believe that Mr. Bauer would have kept that amount of cash in a safe in his bedroom instead of an interest-bearing account and then given it to a friend to gamble.  The government also introduced evidence about claimant's finances and criminal history which it argued tended to show the seized money was involved in the drug trade.  It introduced deposition evidence that claimant had little personal savings and insufficient income to explain the possession of the full amount of seized cash (Pl.'s

Ex. 6).  It also introduced evidence that claimant had been arrested for drug-related offenses on three occasions[1], and was arrested for driving under the influence of alcohol twice (Pl.'s Ex. 6).

## Analysis

Forfeiture is sought in this action pursuant to 21 U.S.C. § 881(a)(6), which provides for the forfeiture of "[a]ll moneys . . . furnished or intended to be furnished by any person in exchange for a controlled substance . . . all proceeds traceable to such an exchange, and all moneys . . . intended to be used to facilitate any violation of [21 U.S.C. § 841 *et seq*.]." Since the enactment of the Civil Asset Forfeiture Reform Act of 2000, the burden is on the government to establish by a preponderance of the evidence that seized property is subject to forfeiture.  18 U.S.C. § 983(c)(1).  Forfeiture is warranted under 21 U.S.C. § 881 when the government establishes a *substantial connection* between the property and a controlled substance offense.  18 U.S.C. § 983(c)(3) (emphasis added).

In a bench trial, "the judge weighs the evidence, determines the credibility of the witnesses, and finds the facts . . . [and] may select among conflicting inferences to be drawn from the testimony."  *United States v. Bales*, 813 F.2d 1289, 1293 (4th Cir. 1987).

### A.  The Government Has Not Established by a Preponderance of the Evidence that the Defendant Funds Were Furnished or Intended to be Furnished in Exchange for Controlled Substances or Traceable to such an Exchange

In forfeiture cases where currency has been seized but no criminal charges filed, the government bears the initial burden of establishing by a preponderance of the evidence that the property is substantially connected to drug trafficking.  Circumstantial evidence is often used by the government to meet its burden of proof.  In this case, the government has not offered any direct evidence linking the seized money to drug proceeds or some intended drug purchase.  It

---

[1] Plaintiff concedes the arrests and that he has one conviction for possession of marijuana.

asks the court to infer an illicit source or use of the money from a set of circumstances: the large amount of currency involved, the canine alert, claimant's previous drug-related arrests, and what the government contends is an implausible explanation for the money's source.

Claimant's evidence shows two legitimate sources for the money: $35,000 from his roommate and $6,500 from his personal income.  The government argues that this evidence is so implausible as to be incredible.  However, the court finds that claimant and Mr. Bauer testified truthfully, that Mr. Bauer gave $35,000 of his own legitimately earned money to claimant for use in gambling, and that the remaining $6,500 was the savings of claimant earned through his employment.

Claimant's unusual explanation of the source of the $35,000 is fully supported by his corroborating witness.  In contrast to claimant's spotty background, Mr. Bauer has an impressive educational and employment history and no criminal record.  He testified that he had benefitted from his house-sitting arrangement with claimant and that he looks on claimant as a little brother (PTT 31).  When pressed on why he would give some $35,000 to a friend to gamble and why he was in possession of so much cash, he provided consistent and plausible answers (PTT 35-41). The government offered no evidence that Mr. Bauer had ever been involved in drug activity. Arguably imprudent use of one's money is not enough to raise an inference of a substantial connection between that money and a controlled substance offense. Mr. Bauer's entirely credible testimony negates any inference that the cash must have an illegal source.

The court finds that claimant's explanation for the source of the remaining $6,500, that he had saved it from his earnings, is also credible.  In 2005, claimant made approximately $50,000 as a consultant.  Claimant testified and Mr. Bauer confirmed that claimant pays no rent to live in

Mr. Bauer's home.  The government offered no evidence, only argument, to rebut claimant's assertion that he had saved the $6,500 in anticipation of his trip.

The remaining piece of evidence on the government's side that is arguably inconsistent with claimant's and Bauer's testimony is the canine alert.   The court assumes that the dog alerted on the money because it was contaminated to some degree by some substance the dog had been trained to notice.  However, properly viewed, this is not inconsistent with claimant's and Bauer's testimony.  In any event it is not sufficient to negate their credibility.

There has been considerable debate about how much probative weight should be assigned to a positive alert by a drug-sniffing dog.  The Fourth Circuit has written that "[e]ven though widespread contamination of currency plainly lessens the impact of dog sniff evidence, a trained dog's alert still retains some probative value."  *United States v. Puche-Garcia*, 2000 WL 1288181 (4th Cir. 2000), *citing United States v. Saccoccia*, 58 F.3d 754, 777 (1st Cir. 1995).  In a recent case addressing the Fourth Amendment, Justice Souter wrote in dissent about the fallibility of drug dogs in general and concluded "the evidence is clear that the dog that alerts hundreds of times will be wrong dozens of time."  *Illinois v. Caballes*, 543 U.S. 405, 411-12 (2005) (Souter, J., dissenting).  A canine alert has been called virtually "meaningless and likely to be quite prejudicial," *United States v. Carr*, 25 F.3d 1194, 1216 (3rd Cir. 1994) (Becker, J., concurring), and "slight" evidence of a connection to the drug trade by the Eight Circuit in *United States v. $84,615 in U.S. Currency*, 379 F.3d 496 (8th Cir. 2004).  Conversely, the Seventh Circuit recently went to great lengths to debunk the theory that a majority of currency in circulation is tainted with cocaine residue leading to false alerts.  *United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 456-460 (7th Cir. 2005).

In this case, the government has not identified what controlled substance the drug-detection canine detected, but it argued the canine alert is entitled to substantial probative weight. It offered evidence that out of 23 positive alerts by Max, drugs or currency were found in 15 instances,  and argued that at least some of the missed alerts should not call Max's reliability into question.

The government's argument seems to be that the only logical reason for money to be contaminated by a controlled substance would be that a drug dealer, presumptively the possessor of the money or a co-conspirator, had packaged the drug in such a way that the money paid for it became contaminated by it during the transaction.  There is no obvious reason why this would occur, and no evidence or rationale was offered to support such a theory.  The government's assumptions appear to be speculative, and the court's research suggests that few if any of the reported opinions rely on such assumptions.

Rather, the case law, including the decisions under the previous probable cause standard, shows that the weight to be given a positive dog alert is contextual.  It has seldom been held to be sufficient, standing alone, to prove the substantial connection to drug activity that supports forfeiture.

 In *United States v. Mondragon*, 313 F.3d 862 (4th Cir. 2002), the Fourth Circuit upheld the district court's denial of a claimant's motion to strike a complaint for forfeiture.  In that case, the claimant was found with nearly $500,000 in a "hidden compartment" in her car, and a drug dog alerted on the area of the car near the compartment.  *Id.* at 866.  Police testified that the compartment was of a type frequently used by drug traffickers.  *Id.*  The claimant argued that the dog alert had no value because of the high percentage of currency in circulation that is tainted with drug residue.  *Id.*  The court held that the complaint was sufficient in that "the nature of the

8

dog's alert, *coupled with the rest of the circumstances*, supported a reasonable belief that drugs had been transported in the car, probably in the secret compartment, and that the currency found in the compartment was linked to drug trafficking." (emphasis in original).  *Id*.

The government seeks support in several other cases in which seizure was upheld by the court.  It is true that each case has one fact or another in common with the current case, and that in each the government's showing was found sufficient.  However, all of the cases cited by the government to support its position include at least one notable fact not present in this case.

In several, the claimant was found in the possession of illegal drugs or other unambiguous evidence of drug activity.  *See United States v. $159,880*, 387 F. Supp. 2d 1000 (S.D. Iowa 2005) (claimant found in possession of records of drug transactions); *United States v. $118,170*, 69 Fed. App. 714 (6th Cir. 2003) (unreported) (claimant found in possession of marijuana at time money was seized, and witness stated that claimant had attempted to purchase drugs from the witness on several occasions);  *United States v. 36,364*, 103 F.3d 1048 (1st Cir. 1997) (law enforcement agents recognized claimant as an associate of known marijuana traffickers, including one who was claimant's business partner and another his employee); *United States v. $84,615*, 379 F.3d 496 (8th Cir. 2002) (claimant found in possession of marijuana and misled law enforcement about the presence of drugs); *United States v. $39,873*, 80 F.3d 317 (8th Cir. 1996) (claimant found in possession of marijuana and rolling papers, and a suitcase containing a roll of duct-tape and a package of dryer sheets, which the court found was drug-related paraphernalia); *United States v. $22,991*, 227 F. Supp. 2d 1220 (S.D. Ala. 2002) (claimant found in possession of crack-cocaine and a home-made crack pipe).  In this case, no drugs or drug paraphernalia have been connected to claimant or Mr. Bauer.

In others, law enforcement officials were acting on a tip or other specific information when they seized the money.  *See United States v. $42,500,* 283 F.3d 977 (9th Cir. 2002) (law enforcement who confronted claimant acting on a referral from a DEA agent); *United States v. $99,900; $4,000*, 69 Fed. Appx. 757 (6th Cir. 2003) (law enforcement acting on a tip of drug activity taking place at a specific motel and in a specific vehicle).  In this case, no evidence was offered that law enforcement had any reason to target claimant on November 3, 2005.

In some other cases a claimant had gone to greater lengths to conceal the money, either in the way it was packaged or in denying its existence.  *See United States v. $30,670,* 403 F.3d 448 (7th Cir. 2005) (claimant concealed the cash in a woman's girdle he was wearing);  *United States v. $141,770*, 157 F.3d 600 (8th Cir. 1998) (claimant put the money in a ceiling panel, behind a trap door, in five, triple-layered zip-lock bags, and wrapped the cash in fabric softener).  *United States v. $124,700 in U.S. Currency*, 458 F.3d 822 (8th Cir. 2006) (currency was wrapped in aluminum foil and placed in a cooler, and claimant denied having the money when asked by law enforcement).  In this case, the money was not secreted or hidden in any obviously suspicious way; it was merely placed at the top of claimant's carry-on bag in envelopes.  It was "hidden" only in the sense that it was not visible from outside the bag.

In addition, in nearly all the above cases the claimant had no explanation for the source of the money or the court expressed doubt as to the veracity of the explanation provided.  Here claimant has a coherent explanation that the court finds credible.  In the circumstances presented here, while the alert is not devoid of probative value, it does not undermine that credibility.

Moreover, the court finds that even if Max's alert be taken as evidence that the money was contaminated by a controlled substance, that combined with the government's other evidence would not establish the required nexus by a preponderance of the evidence.

The court therefore finds that the government has not proved a substantial connection between the seized money and a controlled substance offense by a preponderance of the evidence, and thus the seized money is not forfeit.

### B.  Claimant was an "Owner" of the Currency at the Time it was Seized and Has Standing to Challenge its Seizure.

Before a claimant can challenge forfeiture, he must "first demonstrate a sufficient property interest in the property to give him Article III standing . . ."  *United States v. $38,000 in United States*, 816 F.2d 1538, 1543 (11th Cir. 1987).

The government concedes that claimant has Article III standing to challenge the forfeiture of all the defendant money.   (*See* plaintiff's supplemental brief re: claimant's ownership, docket no. 43 at 4.)  However, it argues that claimant on his own version of the facts cannot recover the $35,000 he received from Mr. Bauer  because he is not an "owner" of that money under 18 U.S.C. § 983(d)(6), which defines the term for purposes of the "innocent owner" defense available to claimants in forfeiture actions. [2]

Most of the case law discussing who is an "owner" for purposes of challenges to civil forfeiture does focus on the "innocent owner" provisions of 18 U.S.C. § 983(d)(2)(A) and § 983(d)(3)(A).  Several courts have noted a distinction between ownership for standing purposes and ownership under the "innocent owner" defense.  *See, e.g.*, *United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1013-15 (8th Cir. 2003).  The government makes much of this distinction in its brief, and it is true that in a claim of innocent ownership of funds otherwise subject to forfeiture, standing and ownership may be two different inquiries.  However, if the

---

[2]   The government has not argued that claimant was not the owner of the other $6,500 when it was seized.

11

funds are from a legitimate source, then for all practical purposes the two issues collapse and

merge: if claimant has standing to challenge forfeiture, and the funds are not subject to seizure,

then claimant will prevail.

As discussed above, in this case the government has not established that there is anything

to be "innocent" of, and therefore arguments that the claimant cannot qualify as an innocent

owner are simply inapposite.[3]

The government attempts two other arguments that should be dealt with.  In its

supplemental brief, apparently operating under the assumption that the court would find the

money to be illicitly derived and that claimant would therefore be making an innocent owner

defense, the government focuses on rebutting that defense.

First, the government argues that claimant is simply not legally an owner of the money

under traditional common law constructs of ownership.  Courts have held that because federal

forfeiture law "contains no rule for determining the scope of property rights, 'it is appropriate to

refer to state law in determining the nature of the property interest' involved in a forfeiture

proceeding."  *See United States v. $3,000*, 906 F. Supp. at 1065 (E.D. Va. 1995) (citation

omitted).  The government contends that claimant's explanation for the money's source, if true,

would make him a donee.  However, on the facts found by the court claimant is the owner,

having received legal title to the money because "legal title to money passes with delivery to a

person who acquires it in good faith and for valuable consideration."  *Id.* At 1066.  As claimant

argues, the situation is analogous to funds being deposited in a bank, in which funds deposited in

---

[3]  It follows that even if there were a substantial connection between the funds and illegal drug activity, making the funds otherwise subject to forfeiture, the court's finding that claimant's and Bauer's testimony is credible would mean that claimant is an innocent owner within the meaning of § 983(d).

a general account become property of the bank and the bank becomes a debtor of the depositor.

*Bernardini v. Central National Bank of Richmond*, 290 S.E.2d 863, 864 (Va. 1982).

Second, the government argues that to the extent claimant has disavowed ownership of the money, he cannot challenge its forfeiture, citing *United States v. Denerak*, 27 F. Supp. 2d. 1300, 1302 (M.D. Fla. 1998) (holding that a claimant who said seized money belonged to someone else and who had  "not come forth with any evidence that he had any ownership interest in the money" did not have standing to challenge its forfeiture).  This argument is based on claimant's explanation about the money's source, specifically his answer of "Oh, no, it wasn't mine, no," to the question "So, there is no way all that money could have come from you, correct?" and statement that he planned to give the money back to Mr. Bauer if he prevailed in this case (PTT 24-25).  The only fair reading of these statements is that claimant was describing the source of the money and not who was its legal owner when it was seized.  Unlike *Denerak*, claimant here has offered evidence of a cognizable ownership interest in the money.

In either case, claimant has a sufficient property interest in the $35,000 seized money to challenge its seizure.

### <u>Conclusion</u>

For these reasons, claimant is now entitled to  return of the defendant funds, and the Clerk shall enter judgment accordingly in claimant's favor.

It is so ORDERED.

_____/s/_____<br>
Thomas Rawles Jones, Jr.<br>
United States Magistrate Judge

January 5, 2007<br>
Alexandria, Virginia